UNITED STATES of America,
Plaintiff,

v.

Frank CARLOW and Fayette National
Bank and Trust Company, Defendants.

Civ. A. No. 69–594.

United States District Court,
W. D. Pennsylvania.

March 11, 1971.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Coldren & Adams, Uniontown, Pa., for Fayette National Bank.

No appearance for Frank Carlow.

## OPINION

GOURLEY, District Judge:

The United States commenced this action pursuant to Sections 7401 and 7403 of the Internal Revenue Code of 1954, 26 U.S.C. §§ 7401 and 7403, and seeks to enforce herein certain federal tax liens and to have determined the merits of all claims to and liens upon the property in question. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1340 and 1345. Judgment by default has been entered in favor of the United States and against defendant Carlow (hereinafter "the taxpayer") in the sum of $13,769.96 plus interest. The present matters before the Court are a Motion for Summary Judgment filed by the United States and a cross-Motion for Summary Judgment filed by defendant Fayette National Bank and Trust Company (hereinafter "the Bank"). Counsel for the respective parties have entered into Stipulations of facts not in dispute. After hearing, the Court concludes that there is no genuine issue as to any material fact, the Motion of the United States should be granted and the Motion of the Bank denied.

In its Complaint, the United States averred that the expiration of the applicable statutory period for the enforcement of its assessment liens had been extended beyond the time of filing suit by virtue of several offers of compromise wherein the taxpayer entered into agreements suspending the running of the applicable statute of limitations. The Bank averred in its Answer that it was without information sufficient to form a belief as to the truth of this averment and thereby effectively denied the averment. F.R.Civ.P. 8(b). Thereafter, counsel for the respective parties neither adverted to the statute of limitations issue in their respective Motions for Summary Judgment nor offered proof at the hearing, by affidavit or otherwise, with respect to this issue. Uncertain as to whether the issue had been abandoned, the Court made inquiry of respective counsel. Thereafter, counsel for the respective parties entered into a Stipulation as to the facts material to this issue and submitted briefs upon a disputed question of law. Accordingly, the Court will resolve this issue before proceeding to the question presented by the Motions for Summary Judgment.

The undisputed facts are as follows. During a period from February 8, 1962 to and including March 20, 1964, eleven federal tax assessments were made against the taxpayer for failure to pay

on demand federal taxes totalling $9,-827.67 in principal amount. On May 10, 1965, the taxpayer submitted to the United States an "Offer in Compromise," Form 656, which provides in pertinent part as follows:

"6. The undersigned proponent waives the benefit of any statute of limitations applicable to the assessment and/or collection of the liability sought to be compromised, and agrees to the suspension of the running of the statutory period of limitations on assessment and/or collection for the period during which this offer is pending, or the period during which any installment remains unpaid, and for 1 year thereafter."

The compromise offer was rejected on June 10, 1965. However, the waiver of the statute of limitations was accepted by the District Director of Internal Revenue on October 12, 1965.

Thereafter, on July 11, 1966, the taxpayer submitted a second compromise offer upon a form identical to the first and containing the same provision for the suspension of the statute of limitations. The waiver of the statute of limitations was accepted by the District Director of Internal Revenue on September 20, 1966. Subsequently, the taxpayer amended the second compromise offer by a collateral agreement dated June 13, 1967 which reaffirmed the taxpayer's previous suspension of the statute of limitations. On May 18, 1970, the taxpayer substituted for the collateral agreement of June 13, 1967 another collateral agreement, again reaffirming his previous suspension of the statute of limitations. The United States has never rejected the second offer of compromise, dated July 11, 1966, and said offer, as modified by the collateral agreement of May 18, 1970, is presently under consideration. The United States filed the instant Complaint on May 13, 1969.

The governing statute of limitations is Section 6502 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 6502, which provides in pertinent part:

"(a) Length of period.—Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun—

(1) within 6 years after the assessment of the tax, or

(2) prior to the expiration of any period for collection agreed upon in writing by the Secretary or his delegate and the taxpayer before the expiration of such 6-year period (or, if there is a release of levy under section 6343 after such 6-year period, then before such release).

The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. The period provided by this subsection during which a tax may be collected by levy shall not be extended or curtailed by reason of a judgment against the taxpayer."

Since more than six years elapsed between eight of the Government's assessments and the date of filing suit, the Government would be barred under Section 6502 from proceeding in Court upon these eight assessments unless the statutory period was suspended by agreement of the taxpayer and the Government.

■■ It has been held by the Hon. Herbert P. Sorg, an associate member of this Court, that an offer of compromise containing precisely the same language of waiver used in the taxpayer's two offers in the instant case effectively suspends the six-year limitation period in accordance with the terms of the offer. United States v. Moyer, 308 F.Supp. 754, 756 (W.D.Pa.1968), aff'd 420 F.2d 375 (3d Cir. 1970), cert. denied 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1971). Where the waiver of the statute of limitations by the taxpayer is accepted by the United States, it is unaffected by the ultimate rejection of the offer in compromise. United States v. Moyer, *supra*,

308 F.Supp. at p. 756. Moreover, where waivers are issued with successive compromise offers, the waivers are cumulative in extending the time for collection. United States v. Havner, 101 F.2d 161, 163 (8th Cir. 939); United States v. Maddas, 109 F.Supp. 607, 612 (W.D.Pa. 1953).

In the instant case, the taxpayer's first offer of compromise was rejected thirty-one days after its submission. Under the terms of the waiver agreement, the six-year limitation period upon the earliest assessment, made on February 8, 1962, was suspended for a year and thirty-one days, thus extending the date of expiration of the statutory period into March of 1968. On July 11, 1966, before the extended date of expiration, the taxpayer proffered his second offer of compromise, accompanied with the identical waiver provision. Because the United States has yet to reject this second offer of compromise, the waiver provision contained therein has acted to extend the expiration date of the limitation period beyond the date upon which the Complaint was filed.

■ Defendant Bank contends, however, that both the first and second offers of compromise were so low as to have required immediate rejection by the United States and that, having failed to reject the second offer within a reasonable period of time, the United States may not claim the benefit of this delay against the Bank.

Section 7122 of the Internal Revenue Code of 1954, which governs compromises, imposes no obligation upon the Secretary of Internal Revenue to reject an offer of compromise within any given period of time. However, § 301.7122–1 of the Regulations, adopted February 3, 1960, does provide in pertinent part as follows:

"(d) (4) *Withdrawal or rejection.* An offer in compromise may be withdrawn by the proponent at any time prior to its acceptance. In the event an offer is rejected, the proponent shall be promptly notified in writing. Friv-olous offers or offers submitted for the purpose of delaying the collection of tax liabilities shall be immediately rejected. If an offer in compromise is withdrawn or rejected, the amount tendered with the offer, including all installments paid, shall be refunded without interest, unless the taxpayer has stated or agreed that the amount tendered may be applied to the liability with respect to which the offer was submitted."

In my judgment, the Bank is not entitled to the benefit of the aforequoted provision.

It is apparent from the very terms of § 301.7122–1(d) (4) that frivolous offers are to be rejected immediately so as to prevent undue delay in the collection of taxes. The provision is for the benefit of the United States, not the taxpayer. The taxpayer is protected from an indefinite suspension of the statute of limitations by his right, afforded by the very same Regulation, to withdraw his offer at any time before acceptance. The taxpayer in the instant case has not seen fit to make such a withdrawal of his second offer of compromise.

■ Moreover, even if the provision for prompt rejection of frivolous offers were partially for the benefit of the taxpayer, which I do not believe to be the case, the Bank, as a third party would not be entitled to such benefit. It is not disputed that, where a' taxpayer enters into an agreement to suspend the running of the statute of limitations, this agreement binds not only the taxpayer but also any party to an action to foreclose the tax lien. United States v. Mojac Construction Corp., 190 F.Supp. 622, 626 (E.D.N.Y.1960); United States v. Maddas, *supra*, 109 F.Supp. at p. 612. Since a third party generally may not challenge the right of the taxpayer to suspend the statute of limitations by agreement with the United States, I conclude that the Regulation in question was not intended to afford a third party such a right in the particular case where the compromise offer accompanying the waiver is frivolous. The agreements be-

tween the taxpayer and the United States extending the expiration date of the limitation period upon all eleven assessments beyond the date of filing of the Complaint herein effectively precludes the Bank, a third party, from raising the statute of limitations defense herein.

I turn, then, to a consideration of the basic issue presented by the cross-Motions for Summary Judgment—whether, at the time of the assessments or thereafter, the Bank possessed property of the taxpayer to which assessment liens could attach.

As previously indicated, during a period from February 8, 1962 to and including March 20, 1964, eleven federal tax assessments were made against the taxpayer for failure to pay on demand federal taxes totalling $9,827.67 in principal amount. Notices of the assessments were filed during a period from February 8, 1962 through September 3, 1964. On November 5, 1964, the United States served an administrative Notice of Levy upon the Bank demanding that all property or rights to property of the taxpayer be turned over to the Government. Despite the receipt of service of this Notice of Levy, the Bank has failed to pay any funds over to the United States.

For some years prior to the period when the United States made the tax assessments in question, the taxpayer had been a customer of the Bank. In the course of his business as a seller of appliances and home improvements, the taxpayer regularly received promissory notes from the purchasers. On March 2, 1959, the taxpayer entered into a "Loan Agreement" with the Bank whereby the Bank agreed to discount such notes. The Loan Agreement further provided for the establishment of a reserve account in connection with the discounting of such notes. In fact, four such reserve accounts were established.

Subsequent to the date of the Loan Agreement establishing the reserve accounts, the taxpayer became personally indebted to the Bank. On June 28, 1962, the taxpayer became obligated to the Bank in the sum of $2,495.52 and, on July 27, 1963, he became indebted for the additional sum of $8,872.92. These obligations arose out of the taxpayer's acquisition of a truck and construction equipment, which were pledged to the Bank as security for the personal debts. The taxpayer subsequently defaulted upon both debts, and the Bank sold a portion of the pledged property. However, deficiencies remained. To satisfy the deficiencies, the Bank set off the existing balances in the reserve accounts on two occasions. Specifically, it set off the amount of $585.51 on September 4, 1964 and the amount of $4,797.80 on September 17, 1964. The Bank then sold the balance of the pledged property and returned $1,185.88 to one of the reserve accounts. There is presently $725.59 in the aforementioned reserve account, which the Bank concedes is due the taxpayer and subject to the tax liens of the United States. In dispute is the right of the United States to recover from the Bank $4,197.43, which is the net amount of the two setoffs which the Bank applied against the reserve accounts at a time subsequent to the Government's assessments upon the taxpayer.

Section 6321 of the Internal Revenue Code of 1954, 26 U.S.C. § 6321, provides as follows:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

Under Section 6322 of the Code, 26 U.S.C. § 6322, the federal tax lien arises upon the date of assessment. Section 6323 of the Code, 26 U.S.C. § 6323 establishes priorities and provides that a federal tax lien shall not be valid with respect to, or prior to, certain other claims to property unless a notice of lien is filed and, in some instances, regardless of whether

a notice of lien has been filed. The Bank's defense, however, does not rest upon any of the specific priorities afforded by Section 6323.

The Bank contends that the four reserve accounts in question did not constitute "property or rights to property" at any relevant time. Therefore, it is reasoned, no federal tax lien could attach to the reserve accounts by virtue of the assessments against the taxpayer. Whether a taxpayer has an interest in particular property to which a lien can attach is determined by state law. Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958). In the instant case, it must be ascertained whether, under Pennsylvania law, the Loan Agreement in question gave the taxpayer property rights in the reserve accounts created by the Agreement.

In detail the Loan Agreement provided that the Bank would purchase from the taxpayer at a discount rate of eight per cent per annum such notes as the taxpayer might receive in connection with home modernization and improvement contracts into which he might enter with customers in the course of his business. It was agreed that the Bank would have "full recourse" against the taxpayer on the notes. Furthermore, it was provided that a reserve account would be established "to be maintained on deposit" with the Bank. On each occasion when the Bank would purchase a note from the taxpayer, it would deduct a given amount from the payment to the taxpayer and "pay" said amount "into the reserve account." If a default in payment of an installment on a note so purchased were to occur, or if the Bank were to deem its security on any note insufficient, it would then have the right to charge the unpaid balance of the note to the reserve account. When all notes purchased by the Bank would be paid in full, the amount in the reserve account then would be paid over to the taxpayer.

The law of Pennsylvania recognizes a distinction between "general" accounts and "special" accounts deposited with a bank. R. M. Bourne & Co. v. Peoples Union Bank and Trust Co., 404 Pa. 519, 172 A.2d 814 (1961); Franklin Savings & Trust Co. of Pittsburgh v. Clark, 283 Pa. 212, 129 A. 56 (1925); Parker v. Hartley, 91 Pa. 465 (1879). "Whether a deposit is general or special depends on the facts and circumstances attending its making * * *." Franklin Savings & Trust Co. of Pittsburgh v. Clark, *supra*, 283 Pa. at 218, 129 A. at 58. It is evident from the terms of the Loan Agreement that funds to be paid into any reserve account established in connection with the Agreement were to serve the sole purpose of collateral security for the payment of the notes purchased by the Bank. See M'Intire v. Blakeley, 12 A. 325, 10 Cent. 925, 9 Sadler 227 (1888).

The Bank contends that, although the reserve accounts were created for the singular purpose stated above, the accounts nevertheless were not "special" accounts. It is argued that no money was actually segregated in these accounts, the accounts being evidenced simply by credits on a bank ledger. This, we believe, is of no moment. Although the Supreme Court of Pennsylvania indicated in the Franklin Savings & Trust Co. case, *supra*, that a requisite element of a "special" account was the segregation of money or other property therein, the later decision of said Court in R. M. Bourne & Co., *supra*, appears to have abandoned such a requirement. Also, we deem it of no moment that the reserve accounts were to serve as collateral securing the Bank rather than a third party. Compare M'Intire v. Blakeley, *supra*, with R. M. Bourne & Co., *supra*, and Parker v. Hartley, *supra*. We believe that the reserve accounts, established for the sole purpose of securing the Bank's recovery upon the notes purchased by it from the taxpayer, were "special" accounts under the law of Pennsylvania.

It is recognized under Pennsylvania law that a "general" account creates simply the relationship of debtor and creditor between the depositor and

the Bank. Franklin Savings & Trust Co. of Pittsburgh v. Clark, *supra,* 283 Pa. at 218, 129 A. 56. This relationship alone creates in a depositor a sufficient property interest to which a federal tax lien may attach. MacKenzie v. United States, 109 F.2d 540 (9th Cir. 1940).

Here, the reserve accounts in question were "special" rather than general accounts. Under the terms of the Loan Agreement, the taxpayer cannot be said to have had less of a proprietary interest in these accounts than he would have had in a general account. In fact, he appears to have had more. By virtue of the provision in the Loan Agreement that the Bank would pay into a reserve account a portion of the purchase price of a discounted note to serve as security for ultimate collection of the note, we believe the taxpayer acquired a vested property right in such funds as were paid into the account at the times when they were so applied, subject to defeasance only upon the contingency and to the extent that the Bank ultimately would find certain notes to be uncollectible. Consequently, the funds deposited into the reserve accounts constituted "such property or rights to property" in the taxpayer as would be subject to the attachment of federal tax liens.

■ A federal tax lien attaches not only to property and property rights owned by the taxpayer on the date of assessment but also to such property and property rights which the taxpayer acquires thereafter during the continued existence of the lien. Thus, by virtue of the assessments against the taxpayer during the period from February 2, 1962 to March 20, 1964, the continuing federal tax liens attached not only to funds in the account on the dates of the assessments in question but also to such funds as were thereafter paid into the reserve accounts during the continuing existence of the liens. There is no dispute that the liens have continued to the date of filing suit.

■ The question remains, however, as to whether the Bank was entitled to the setoffs of September 4, 1964 and September 17, 1964 against the reserve accounts, free and clear of the federal tax liens arising from assessments made prior to the setoffs. No general right of setoff was afforded to the Bank under the terms of the Loan Agreement itself. Thus, if such a right existed, it had to be one afforded by law.

Under the law of Pennsylvania, funds deposited in a bank for a special purpose, known to the bank, or under a special agreement, cannot be set off by the bank against an unrelated debt due to it from a depositor. R. M. Bourne & Co. v. Peoples Union Bank & Trust Co., 404 Pa. 519, 172 A.2d 814 (1961). See also M'Intire v. Blakeley, *supra.* The reserve accounts were "special" accounts. The Bank's attempted setoffs therefore were invalid.

It may be noted that we are not presented with a question of the respective priorities of the Bank's security interest in the reserve accounts and the federal tax liens. The Bank ultimately recovered in full upon all of the notes purchased by it and, accordingly, even if the Bank's security interest previously had been entitled to priority over the federal tax liens, the Bank's security interest now has terminated under the conditions of the Loan Agreement.

The assessments gave rise to perfected tax liens upon the amounts in the reserve accounts on the dates of assessment and paid into the account thereafter. The Bank's attempted setoffs against these special purpose accounts subsequent to the assessments were invalid under State law. Accordingly, the Bank is liable to the United States in the amount of $4,923.02, that amount being the sum of the net setoff of $4,197.43 and the amount of $725.59 currently on deposit in reserve account 800–313.

An appropriate order is entered.